CASE 5—PETITION ORDINARY—DECEMBER 11.

# Hughes vs. Todd.

### APPEAL FROM FRANKLIN CIRCUIT COURT.

1. Where the owner of a slave hired him to another for a year, and, before the expiration of the term of service, the slave escaped, and was enlisted in the Federal army, whereby the hirer lost the residue of his services, the owner was not responsible for such loss, nor was the hirer entitled to any abatement of the price agreed to be paid for the hire.

2. In a contract of hiring there is no implied guaranty of full service for the term; the sickness, death, or escape of the hired slave will be no failure of consideration; but the hirer will be entitled to indemnity if he be evicted under a paramount title.

3. The government had no interest in, nor title to, slaves; its only right was the political power to take private property for public use, on payment of its full value, to be ascertained on judicial proof of it. Congress has no power to fix the value of any property so taken.

4. The right to the services of a hired slave is the property of the hirer, and the government had no more right to take that, without compensation, than to take the slave from the owner; the hirer must look to the government for reparation, and if it has not and will not pay him, its act was unconstitutional, and was, therefore, not a lawful eviction, under title, but a wrongful abduction without title.

T. N. LINDSEY, for appellant, cited 1 *Bibb*, 537; 1 *Litt.*, 15; 5 *Mon.*, 360; 2 *Dana*, 248; 2 *Parsons on Contr.*, 185 *and note; Chitty on Contr.*, 697, 734.

J. MASON BROWN, for appellee, cited 1 *Domat Civ. Law, par.* 485; *Alcyn*, 26; 3 *Burr.*, 1639; *Vat.*, bk. 1, &h. 20, sec. 244; *Const. U. S.*, art. 1, sec. 8; *Taylor on Land. and Ten.*, 183; 1 *Fonb. Eq.*, 378–9; *Ambler's Rep.*, 619; 5 *Mon.*, 539; 2 *Hen. & Mun.*, 5.

JUDGE ROBERTSON DELIVERED THE OPINION OF THE COURT:

The appellant sued the appellees on their joint note executed to him in January, 1864, for the payment of $150 for the hire of his slave *Marshall* for that year, without any express reservation or qualification.

The appellees resisted a judgment for the entire amount of the note, on the allegation, admitted by demurrer, that the slave, long before the expiration of the term of service,

escaped, and was voluntarily enlisted as a soldier in the Federal army, whereby the hirer, Todd, lost the residue of his services, and, thereupon, they claimed a credit, *pro tanto.*

The circuit court, overruling a demurrer to the answer, adjudged the abatement as claimed.

The hire of a slave, *per se*, implies that the hirer gives the stipulated price for the guaranteed title of the owner, at the time of hiring, to the dominion and service of the slave during the term. There is no implied guarantee of full or useful service for the entire term, or for any portion of it. Consequently, the consideration being entire and only for the best *title* to the service of the slave during the term, the sickness, or death, or escape of the hired negro, will be no legal failure of consideration, total or partial, and the resulting loss must be borne by the hirer, who, by failing to provide for any such contingency, is presumed to have undertaken the risk of all such accidents without any right to an abatement of the price he unconditionally promised to pay to the owner for the privilege of standing in his shoes and taking his chances. · This principle has long been settled by this court, and appears to us to be as rational and as consonant with policy and justice, as it is authoritative.

But, on the other hand, the mere hiring implies a contract for indemnity if the hirer shall be evicted or disturbed by any lawful intrusion or eviction under a title paramount, or by the act or authority of the other contracting party. And, insisting that the enlistment of the slave was such eviction, the appellees urge this as a sufficient ground for sustaining the judgment for their partial exoneration. But we cannot so adjudge for the following reasons :

1st. It is not alleged that the appellant was, in any way, instrumental in the escape or the enlistment of his slave Marshall. Nor is his perfect and exclusive title to the slave, as his property, disputed. But the flight and enlistment seem to have been the voluntary acts of Marshall himself. He was not drafted or forcibly taken from the hirer by the Federal government; and, had he not, by his own volition, left the hirer's service and volunteered into that of the United States,

the government would not have detained him or disturbed the hirer's use of him. But, as the owner made no implied guarantee of indemnity against the voluntary acts of the slave, the hirer is presumed to have agreed to risk them. The enlistment was a contract between the government and the slave, for which the owner was not responsible. If the slave, instead of fleeing to and enlisting in the Federal army, had run away to *Canada*, and been there protected from reclamation by the colonial government, according to international right, no Kentucky jurist would claim for the appellant any indemnity from the owner. Why, then, should he be entitled to any in this case? In neither case should the deprivation be considered an eviction under a paramount title, and, in each alike, it should be deemed the accidental result of the negro's own acts—*which he might not have done had he not been under the control of the hirer.*

It does not seem, therefore, consistent with either the principle or policy of the doctrine recognized here, to hold the owner liable for the hirer's loss of service any more than it would be to hold the hirer liable to the owner for his much greater loss arising from the conduct of his slave, while under the care and control of the hirer as the owner's bailee.

2d. At the time of hiring, the appellant was the exclusive owner of the slave—the government had no property in him, nor title to him *as a slave;* its only and utmost right was the political power, as sovereign, to take private property for public use *on paying or assuming the payment of its full value, ascertained on judicial proof of it.*

This prerogative is recognized, and guarded against arbitrary discretion or abuse, by the Federal as well as our State Constitution; and both parties to the contract of hiring must be presumed to have known that the hireling might be lawfully taken from the hirer, as well as owner, for the public use, according to the supreme law. The act of Congress authorizing the enlistment of slaves into the Federal army only prescribed for the occasion that mode of appropriating that kind of property to public use; it did not originate the

power, which was inherent, and only conservatively guarded by the Constitution.

The fact, therefore, that this famous statute was enacted since the date of the contract in this case, is altogether immaterial. The parties knew, before the enactment of it, as well as since, that the hireling might be lawfully taken by the government from the hirer and the owner. And, *in the enrollment, the government acknowleged that the slave was, as he had guarranteed, the property of the appellant.* This enlisting, even if it had been against the will of the slave, the owner, and the hirer all, cannot be that kind of eviction under paramount title for which the owner was expected, or, by implied contract, agreed, to be responsible to the hirer. On the contrary, the hirer, aware of the possible loss of service by the act of the government, chose to provide no security against it any more than against the death or running away of the slave; and, consequently, he should be presumed to have braved the danger of all those contingencies alike, as he surely would be presumed to have done had the subject been land, and an army of the United States, by encamping on it, had obstructed or prevented the use of it—in which case his claim would have been against the government and not against his landlord. So, in this case, the hirer's right to the hireling's service was *his* property, and government could not constitutionally deprive him of it or of any portion of it without his consent or just compensation, any more than if his term had been for life instead of one year. He, like the owner, must look alone to the government for reparation. And, if the government has neither paid him nor will pay him, its act was unconstitutional and void as to him, and was, therefore, not a lawful eviction under title, but a wrongful abduction without title. It does not appear that the owner has received either the payment or the assurance of the full value of his slave, or of any value constitutionally ascertained and fixed. And, therefore, he cannot, by substitution, or trust, or otherwise, be made liable to the hirer for *his* partial loss.

3. But, as just intimated, even if the enlistment should be deemed a taking by the government as much as drafting

would have been, the eviction was not lawful, but wrong-
ful and unconstitutional; and, for such an eviction, the owner
is not responsible according to the legal effect of his contract.
Although the government may have had no right to appro-
priate more than the services of the slave during the term for
which he volunteered, yet it has declared him free—and,
right or wrong, he may be treated as lost for ever to his
owner. The act of taking the slave was, therefore, uncon-
stitutional and void as to its legal effects, unless the govern-
ment either prepaid or assured the payment of his actual
value to his owner. This, according to the act of Congress
under which the slave was enlisted and to the answer of the
appellees, the government has not done. The only offer or
promise to pay is made in that act—and that limits the max-
imum to $300, even though the slave may have been worth
$1,500. If the government itself can constitutionally fix the
value of property it takes for public use, *its arbitrium*, and not
the real value, is the standard of right  To prevent all such
possible abuse of the right of *eminent domain* was the object
of the great fundamental guarantee of private property.
If the government has power to fix at $300 the value of a
slave worth $1,500, it may as well fix it at one dollar or
declare that it is of no value. The actual value is evidently
the measure of right, and that can be ascertained only by
testimony. If this be not so, the boasted *palladium* of private
property against arbitrary power is but a mockery, and the
constitution itself may become a dead letter.

We are, therefore, of the opinion, that there has been no
lawful eviction under a paramount title, and, consequently,
that the appellant is not responsible for the loss of service
resulting to the hirer from the enlistment of the slave Mar-
shall.

[See dissenting opinion of Judge Williams, page 202.]